Randall Mark MARLER

v.

INTERNATIONAL GRAIN CORPORA-
TION, Ray Stewart d/b/a S&S Sheet
Metal Company, and Houston General
Insurance Company.

Civ. A. No. 78–459–A.

United States District Court,
M. D. Louisiana.

Oct. 8, 1981.

William P. Rutledge, Lafayette, La., for
plaintiff.

Lemeuel E. Hawsey, III, Baton Rouge,
La., for defendants.

JOHN V. PARKER, Chief Judge.

This is an action for personal injuries
brought against the owner of a barge by an
employee of an independent contractor who
was injured aboard the vessel which was
moored in the Mississippi River at Baton
Rouge, Louisiana. The Court holds that
there is no liability.

The cause of action is laid under § 5(b) of
the Longshoremen's and Harbor Workers'
Compensation Act as amended in 1972, 33
U.S.C. § 905(b), and this Court has jurisdic-
tion pursuant to 28 U.S.C. § 1331(a). The
action was tried to the Court sitting with-
out a jury, *Bynum v. Patterson Truck
Lines, Inc.*, 655 F.2d 643 (5th Cir. 1981), and
this opinion shall constitute the findings of
fact and conclusions of law required by
Rule 52, Fed.R.Civ.P.

FACTS

Defendant, International Grain Transfer,
Inc., is a Louisiana corporation owned en-
tirely by two individuals, Richard L. Com-
stock and Odis F. Haymon. In November,
1977, International acquired a flat top tank
barge, re-named it Commit, II, removed it
to a ship yard where it was cleaned, sand-
blasted, and painted and a pedestal for a
crane was installed. In January and Febru-
ary, 1978, a crane was mounted on the deck
of the barge and it was towed to an anchor-
age on the bank of the Mississippi River at
Baton Rouge. International retained a ma-
rine architect who prepared plans and speci-
fications for conversion of the barge into a
floating grain elevator to be used in loading
grain aboard vessels in the Port of Baton
Rouge. The owner contracted with a con-
tractor to complete the work according to
plans and specifications but that contract
was soon terminated.

In March, 1978, International contracted
with Ray Stewart d/b/a S & S Sheet Metal
Company, a resident of Baton Rouge to
complete all remaining work according to
plans and specifications. The conversion
work included erection of a steel super-
structure the height of which was 80 to 108
feet above the deck of the barge.

Plaintiff, Randall Mark Marler was a shore based ironworker employed by the contractor, Stewart, to work aboard the barge. At the time of the accident, the vessel had no crew. During the construction work, the deck mounted crane was utilized by the contractor to raise materials and sometimes to raise and lower workmen and tools. This was accomplished by means of a "cage" suspended by a cable attached to the crane.

The accident and resulting injuries to the plaintiff occurred on June 23, 1978, when he fell from a height of about 40 feet while attempting to climb down the I-beams of the superstructure to the deck of the barge. The evidence establishes that the owners of International, Haymon and Comstock, visited the barge daily during the construction period for the purpose of monitoring the progress of the work. Although some of the ironworkers testified that they thought Haymon and Comstock were supervising construction, the Court finds as a fact that International's representatives were simply observing, not directing the work or the workers. Indeed, plaintiff concedes in brief that this is not a case of "retained control" of job performance by the vessel owner. See, *Walker v. Blacksea S.S. Co.*, 637 F.2d 287 (5th Cir. 1981).

On either the day of the accident or the day before, the "boom stops" on the crane were bent when the contractor extended the boom too far. Haymon was apprised of this development and directed that the "stops" be removed for repair or replacement. No repairs were accomplished prior to the accident.

During construction, the ironworkers reached their places of work upon the superstructure by means of the "cage" attached to the crane, by using ladders which the contractor was responsible for installing upon the superstructure or by climbing the I-beams of the superstructure itself. The evidence indicates that the contractor, Stewart, furnished two safety belts for use of workers upon the superstructure but that no safety belts suitable for climbing were furnished to the workers by the contractor.

On the day of the accident, the superstructure had already been "topped out" to its maximum height but all work was not yet completed. Ladders had been permanently installed to a height of about 40 feet and the contractor was in the process of installing ladders at higher elevations.

Haymon was at the barge on the afternoon of the accident but was not present at the time of the accident. The accident occurred at or immediately after the usual quitting time for the workers.

The workers were prepared to leave the job when they were ordered back aloft by Stewart. They declined to utilize the crane because they felt that it was unsafe, because of the damage to the "stops", although the crane was used to transport tools up to them. Plaintiff and another worker were instructed to complete installation of a ladder at the area of the catwalk which was near the highest elevation of the superstructure. They did not permanently attach the ladder but simply secured it with a "tack weld" and a rope. Both ascended to the work site by climbing the I-beams of the superstructure and plaintiff was descending in the same fashion when he fell to the deck of the barge. Plaintiff does not know what caused him to fall nor did anyone else who testified.

The contractor's foreman testified that as men were about to secure the job site and go home, Ray Stewart came to him and informed him that additional work had to be done before the men left the job but he testified that he objected, pointing out that the crane was not safe and that the men were tired but that Stewart informed him that if the men wanted their jobs, they had to go back up and finish the work which he outlined.

Plaintiff implies that these instructions from the contractor, Stewart, came from Haymon; the Court however finds that there is no evidence to support this conclusion. Haymon was not present at the time instructions were given and neither Haymon nor Comstock were present at the time of the accident.

Plaintiff suffered severe injuries in the fall but, since the issue of liability is resolved against the plaintiff, the injuries will not be detailed here.

## LAW

Under 33 U.S.C. § 905(b), the owner of a vessel is liable to any maritime worker who is injured because of the negligence of the owner. The 1972 Amendment to § 905(b) specifically prohibits imposition of liability under the warranty of seaworthiness. Thus, in order to recover, the injured worker must establish the actual negligence of the vessel owner.

Plaintiff, an ironworker employed in converting the barge from one maritime use to another, while the vessel was at anchorage in the Mississippi River, was clearly a person engaged in maritime employment under § 902(3) and thus is a person entitled to bring an action against the owner under § 905(b).

In determining the issue of vessel owner negligence, it is important to clearly delineate the duties and responsibilities of the various parties.

Section 941 makes it the specific duty of the *employer* to provide a "reasonably safe" place for his employees to work. Here that duty was upon the contractor, Stewart, not the owner. International had no duty to provide safety equipment for use by employees of the independent contractor. Thus, Stewart's failure to provide climbing safety belts cannot be imputed to the vessel owner.

The contract between Stewart and International called for completion of the structure by the contractor and International made no attempt to determine methods of construction. In fact, the evidence established that neither Comstock nor Haymon knew anything about ironwork and neither made any attempt to instruct Stewart's employees in job performance.

Plaintiff's theory is that because Comstock and Haymon were both frequently at the job site, International knew that the crane had been damaged and thus was not a safe means for transportation of the workers and that in the face of this hazard Haymon ordered Stewart to send the men back up to complete the work. As noted previously, the Court finds no factual basis for the conclusion that Haymon entered any such order. On the contrary, the Court finds that the owner of the vessel simply made regular exhortations to Stewart to hurry up and complete the work.

Plaintiff argues that International's negligence was in its failure to have the ladders properly installed before the crane was damaged, insisting that if the ladders had been installed there would have been a safe method of ascent and descent and the plaintiff thus would not have been injured.

This argument overlooks the fact that it was the duty of the contractor, Stewart, not the owner, to install the ladders. The ladders were an integral part of the conversion work contracted to Stewart and the owner ordinarily has no duty to protect employees of an independent contractor from risks inherent in the performance of the contract. *West v. United States*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed. 161 (1955); *Hess v. Upper-Mississippi Towing Corp.*, 559 F.2d 1030 (5th Cir. 1977) cert. den. 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978).

The most recent consideration of vessel owner negligence by the Supreme Court is the case of *Scindia Steam Navigation Co., Ltd. v. De Los Santos, et al.*, —— U.S. ——, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

There, the Supreme Court held that a shipowner has a duty of reasonable care to employees of stevedores or other maritime employers. That duty of reasonable care does not include a continuing duty to inspect the gear or cargo operations once the independent contractor begins work and the vessel cannot be charged with the negligence of the contractor or his employees. Injured maritime employees are to be placed in the same position that they would have been if they had been injured in non-maritime employment ashore and no special maritime theory of liability, such as the doctrine of unseaworthiness, is to be employed. The defense of assumption of the

risk is not available nor is the doctrine of contributory negligence, although the comparative negligence of the plaintiff may be taken into consideration.

The Supreme Court pointed out in *Scindia*, supra, that the shipowner's duty of due care extends, at least, to have the ship and its equipment in such condition that an expert and experienced contractor would be able by the exercise of reasonable care to carry out the necessary operations with reasonable safety and to warning the contractor of any hazards on the ship with respect to its equipment that are known to the vessel or should be known in the exercise of reasonable care and that are not known by the contractor and would not be obvious to him. The Supreme Court declined to adopt the view that a shipowner's mere knowledge of danger is sufficient in and of itself to impose a duty to correct the situation and held that if the shipowner should anticipate that an independent contractor will not or cannot correct the danger and that the employees cannot avoid it, then the shipowner's duty is triggered to take reasonable steps to eliminate or neutralize the hazards. The Court concluded that there may be circumstances in which the shipowner has a duty to act where the danger to the employees of the independent contractor arises from the malfunctioning of the ship's gear being used by the contractor.

Here the damage to the vessel's crane was caused by the contractor himself and thus he clearly had knowledge of the defect and there is no evidence to support a conclusion that International should be charged with responsibility for Stewart's handling of his employees. The vessel owner is answerable only for its own negligence and it has no automatic responsibility for conditions caused by the negligence or other defaults of the independent contractor. Since the defense of assumption of the risks is not available to the shipowner, International cannot defend on the grounds that the plaintiff should have refused to continue working in the face of obviously dangerous conditions, *Scindia*, supra, but there is simply no evidence here to support a conclusion that this vessel owner violated any duty owed by it to employees of the independent contractor.

Ironworking is at best hazardous under any conditions. The hazard to these ironworkers did not arise from a malfunction of the ship's gear. The evidence indicates that the crane was still operational although with "stops" removed it would certainly require careful handling; moreover, there is no evidence to support the conclusion that International directed that the employees return aloft or even that International was aware that Stewart had delivered such instructions. Neither is there any evidence to support the conclusion that International had any specific knowledge concerning any additional risks imposed upon the ironworkers because of the damage to the "stops" on the crane. As noted earlier, the duty to furnish safety equipment for climbing purposes, both safety belts and installation of the ladders was upon the contractor, not upon the owner and the owner was entitled to assume that the contractor would take the necessary steps and provide the necessary equipment to insure a "reasonably safe place" for his employees to work.

Plaintiff has failed to prove any negligence upon the bargeowner and, accordingly, there will be judgment in favor of the defendant and against the plaintiff.